## ILLEGAL APPOINTMENTS UNDER THE CIVIL SERVICE LAW.

Superior Court of Cincinnati.

PHILIP TIERNAN, A TAX-PAYER, v. THE CITY OF CINCINNATI ET AL.

Decided, March 22, 1915.

*Civil Service—Vacancies Created by Abolishing Positions—Rights of Incumbents of the Offices Abolished—Names Once Placed on the Eligible List Can Not be Removed—Council Can Not Fix Qualifications of Applicants by Ordinance—Necessary Parties to a Determination as to Whether Appointments Have Been Illegally Made.*

1. A vacancy can not be created in a position in the municipal service by an ordinance which abolishes the position and then re-establishes exactly the same position under a different name.
2. The sole purpose of the rule and the statute requiring the head of a department to notify the commission when any position is abolished and to furnish the names of incumbents thus losing their places, is to compel the commission to put back on the eligible list the names of such incumbents.
3. The civil service commission may refuse to admit to examination an applicant who lacks the established requirements, and after examination may refuse to certify one who has passed the examination but has thereafter been found lacking; but the commission has no authority to remove from the eligible list names which have been certified for appointment in answer to the requisition of an appointing officer.
4. For an appointing officer to refuse to appoint persons who have been certified to him as eligible and to have such names removed from the list is in violation of law, even though he believes such persons are incompetent or inefficient or even immoral or vicious.
5. A municipal council has no authority to fix by ordinance the qualifications which shall be required of applicants for any office or position in the competitive service in the respect specified by the statute, and determination of the amount of experience which shall be required of such applicants is specifically conferred on the civil service commission.

*Moulinier, Bettman & Hunt,* for plaintiff.

*Walter M. Schoenle* and *Chas. A. Groom,* City Solicitors, contra.

PUGH, J.

This is an action brought by Philip Tiernan, a tax-payer, against the city of Cincinnati, Edward S. Keefer, John J. Weitzel and Andrew H. Poppe, composing the civil service commission of said city, and William Leiman, the city auditor, and Richard B. Witt, the city treasurer, to restrain the misapplication of the city's money.

The city solicitor was requested to bring this action and, upon his refusal, the present tax-payer's suit was begun. As will hereafter appear, the plaintiff, Philip Tiernan, was personally interested in the transactions out of which this litigation arose, but has no present interest in the controversy other than that he is fully authorized by Sections 4311 and 4314, General Code, to maintain the suit.

On January 7th, 1913, Philip Tiernan and Reuben J. White were duly appointed to the positions of "tenement house inspectors" at a salary of $1,400 per annum, and Lewis S. Arnold was appointed to a like position at the same salary on March 3d, 1913.

These positions were created by an existing ordinance of the city of Cincinnati (Ordinance Code, Section 333-10, p. 121), and were all in the sub-department of buildings of the department of public safety. They were in the competitive classified service as defined by the civil service law of this state and the appointments were duly made from a competitive eligible list furnished by the civil service commission of the city of Cincinnati.

On February 11th, 1913, the council of the city of Cincinnati passed another ordinance whereby *inter alia*, Section 333-10 aforesaid was repealed and the "sub-department of housing inspection of the department of public safety" was created, and the appointment of "housing inspectors," at a salary of $1,400 per annum was authorized (Ordinance No. 100, February 11, 1913, Ordinance Code, Sections 226 and 339-3). This ordinance took effect sixty days after its passage and at a time when Tiernan, White and Arnold were serving as "tenement house inspectors" under the former ordinance. All concerned, obviously regarded the "housing inspectors" created by Ordinance

No. 100 as nothing more or less than the "tenement house inspectors" of the older ordinance under a new name, and, indeed, the distinction is without difference. White and Arnold were permitted to perform the duties of "housing inspectors" and continued to do so for some sixteen months after Ordinance No. 100 went into force without any formal re-appointment and, apparently, without any suggestion from any one that any real change had taken place.

On July 15th, 1914, the council of the city of Cincinnati passed a third ordinance whereby the sub-department of "housing inspection" was changed to the sub-department of "buildings" and the positions of "housing inspectors" were abolished and the appointment of three "deputy inspectors of buildings" provided for instead (Ordinance No. 410, 1914, Sections 226 and 333-8a).

The difference between the positions of "tenement house inspector," "housing inspectors" and "deputy inspectors of buildings" provided for by these three ordinances is merely nominal. The qualifications required by the ordinances for appointment are identical. The qualifications of applicants for any one of these positions, as determined by the civil service examinations, are the same as those required for any of the two others. Any person on the eligible list for any one of these places was eligible for the others. So far as the legislation contained in these ordinances is concerned, there has been no real change in the position of "tenement house inspectors" since the original appointment of Tiernan, White and Arnold—except in name.

The court believes that a vacancy can not be created in a position in the competitive classified municipal civil service by an ordinance which abolishes the position and then re-establishes exactly the same position with merely a change of name. It would certainly be contrary to the intendments of the civil service act that an incumbent in the classified service, duly qualified in competitive examination, placed upon the eligible list by the civil service commission and legally appointed therefrom, could be removed by an ordinance of the municipal council which purports to abolish the position but in reality continues it in existence under another designation. It is unnecessary, however, in

the determination of the present controversy to pass upon this issue.

The ordinance of July 15th went into effect August 17th, 1914. Tiernan, White and Arnold, who were described as "tenement house inspectors" by the terms of the ordinance under which they were appointed and as "housing inspectors" by the ordinance of February 11th, 1913, under which they were permitted to continue their incumbency without re-appointment, evidently believed that their incumbency had been terminated and at once applied to the municipal civil service commission to have their names placed upon an eligible list for positions requiring similar qualifications and calling for similar duties to those from which they believed they had been removed by the ordinance in question.

Section 107 of the "Rules and Regulations of the Civil Service Commission of Cincinnati" provides as follows:

"When any office or position in the classified service is abolished it shall be the duty of the head of the department to notify the commission in writing forthwith, and the name or names of the incumbents shall be placed in the order of the notice to the commission at the head of an eligible list for positions requiring similar qualifications and calling for similar duties, to be certified therefrom according to law."

The civil service law of this state (Section 486-16, General Code) also provides:

"Whenever any permanent office or position in the classified service is abolished or made unnecessary, the person holding such office or position shall be placed by the commission at the head of an appropriate eligible list, and for a period of not to exceed one year shall be certified to an appointing officer as in the case of original appointments."

In pursuance of the statute and the rule quoted, the civil service commission placed the names of Tiernan, White and Arnold on the eligible list for any positions in the sub-department of "buildings" requiring similar qualifications and calling for the performance of duties similar to those of the positions which were thought to have been abolished by the ordinance of July

15th, 1913. On August 17th, 1914, the director of public safety notified the civil service commission in writing that the ordinance of July 15th, 1914, had become effective and that, *inter alia*, it abolished the positions of "housing inspectors" of which Philip Tiernan, R. J. White and Louis S. Aruold were "incumbents." The cummunication begins thus:

"HON. CIVIL SERVICE COMMISSION. Gentlemen:
"Pursuant to the requirements of rule No. 107 of your commission, we hereby notify you that Ordinance No. 410, 1914, passed July 15, 1914, is effective this date, having been filed with the mayor on the 17th July."

The Rule No. 107 referred to is the one above quoted, which requires the "head of the department" to notify the commission when any position is abolished and to give "the name or names of the incumbents," so that they may be placed at the "head of an eligible list" for positions requiring like qualifications and calling for similar duties. The sole object of this rule (and the statute to the same effect, Section 486-16, General Code, above quoted) is to compel the civil service commission to put back on the eligible list the names of incumbents who had been appointed after competitive examination and where offices or positions for any reason had been abolished. In sending this communication, the director of public safety, as head of his department, complied with the letter of both the rule and the statute, and the commission did likewise in placing the names of Tiernan, White and Arnold again on the eligible list.

On September 28th, 1914, the director of public safety sent a requisition to the civil service commission for an eligible list from which "to fill the position of deputy housing inspector," and, in reply, the commission certified to him the names of Philip Tiernan, R. J. White and Louis S. Arnold. There were no other names eligible for these positions at this time.

Assuming that there was a position in the classified service to be filled, everything required by law had been done when the civil service commission, in answer to the requisition of the director of public safety, sent the latter an eligible list containing the names of Tiernan, White and Arnold, and it remained only

for the director to make the appointment from the names thus certified. The civil service act (Section 486-13, General Code) provides:

"The appointing officer shall notify said commission of each position to be filled separately, *and shall fill such position by appointment of one of three persons certified to him by the commission therefor.*"

This statute is mandatory. No discretion is left the appointing officer and no reason or excuse for non-compliance with this law can legally exist. No appointment can legally be made except from the list thus certified. One main object of the civil service act is to compel appointing officers to select and appoint to places of public employment such persons, and such persons only, as have succeeded in getting upon the eligible list by competitive examination, and to take away from such appointing officers, save in a few carefully excepted instances, all discretion and authority to make appointments in any other way. The fact, if such it be, that the persons whose names are certified by the commission are objectionable to the appointing officer on political, religious or personal grounds, does not relieve him from the necessity of making the appointment from the list. The belief of the appointing officer that all of the persons whose names are on the eligible list are incompetent or inefficient, or even immoral or vicious will not justify him in refusing to make the appointment.

It is for the civil service commission and not for the appointing officer to determine whether or not applicants for public employment are competent, efficient and of good character, and the civil service act not only provides a method for determining such competency and efficiency but, in addition, bestows ample power upon the commission to prevent by competitive examinations unfit or inefficient persons being certified for public employment. The language of the civil service act (Section 486-10, General Code) leaves us in no uncertainty on this point when it provides, in reference to the examinations to be held by the civil service commission, as follows:

"All applicants for positions and places in the competitive classified service shall be subject to examinations which shall be

public, competitive and free for all, with specified limitations, *determined by the commission, as to citizenship, residence, age, sex, experience, health, habits and moral character.*"

Furthermore, when an application is made for examination, it is provided by Section 486-11, General Code, that:

"The commission may require in connection with such application such certificate of citizens, physicians or others having knowledge of the applicant as the good of the service may demand. The commission may refuse to examine an applicant, or after examination to certify an eligible, who is found to lack any of the established preliminary requirements for the examination or who is physically so disabled as to be rendered unfit for the performance of the duties of the position which he seeks or who is addicted to the habitual use of intoxicating liquor or drugs to excess, or who has been guilty of any crime or of infamous or notoriously disgraceful conduct, or who has been dismissed from the public service for delinquency or misconduct, or who has made false statements of any material fact, or practiced or attempted to practice any deception or fraud in his application, in his examination, or in establishing his eligibility or securing his appointment."

The intent of this statute is obvious. The civil service commission may refuse to admit to examination any applicant who lacks the established requirements; *even after examination* it may refuse to certify a person who has passed the examination but has thereafter been found lacking, but, once placed upon the eligible list and certified for appointment in answer to a requisition of an appointing officer, even the civil service commission can not remove such person's name from the list. It was never intended to bestow upon the commission an absolute power of determining who should or should not be appointed to public service. The authority given is ample but is restricted within carefully defined limits. The appointing officer, however, is given no discretion whatever other than that of deciding which of the persons named in the certified list he will select.

When the eligible list, containing the names of Tiernan, White and Arnold, was certified, as above related, the director of public safety refused to make the appointment. He objected to the names certified to him and at once took steps to have them re-

moved from the list. In view of the precise and mandatory provisions of the civil service act, what he did, in this regard, was in violation of that law.

September 30th, 1914, on receipt of the certified eligible list, the director of public safety sent a communication to the civil service commission in which he said, *first*, that the persons whose names the commission had certified to him were not efficient; *second*, they had not had the experience required for such positions; *third*, the civil service commission is desired to establish an "efficiency rating for submission to this department," and to this end, the commission will be furnished with efficiency records of the persons whose names it has already certified, which records will be made up for that purpose; and *fourth*, that Rule 135 of the civil service commission, relating to efficiency records is "at variance" with the statute of the state as embodied in the civil service act, Section 486-18, General Code.

From what has already been said, it is apparent that as matter of law the director was not authorized to object to the persons whose names were certified by the commission, and as matter of fact, the efficiency of those persons had already been established by the only method authorized by law, viz., competitive examination, and they had accordingly been certified as efficient by two successive civil service commissions.

The city ordinance purporting to create the positions of "deputy inspectors of buildings" prescribed that appointees should have five years' "experience" in the building trade, and it is to an alleged lack of "experience" in this respect that reference is made in the communication above quoted.

The civil service statute above quoted (Section 486-10, General Code), having declared these examinations are to be "free for all," except as to such limitations in certain respects as shall be determined by the commission," it would seem that the municipal council had no power to change or amend this act of the Legislature by assuming to itself the right to fix by ordinance what should be required of an applicant for any office or position in the competitive classified service in the respects specified in such statute. The authority to determine what "experience" shall be required of applicants for positions in the competitive

classified service is specially conferred on the civil service commission by this law and any exercise of such authority by any other board, council, or officer would thereby be denied. In any event, the appointing officer had no authority in the matter.

The director acted under an erroneous view of the law when he stated that Rule 135 of the civil service commission was at variance with the civil service act (Section 486-18, General Code) and this mistake probably led to his subsequent interference with the commission in the performance of the duties imposed on it by law. The statute to which he refers directs the commission to make investigation and establish efficiency records of incumbents of public offices and positions and then provides:

*"The commission shall report to the officer in charge of a department,* board, commission or institution its findings and recommendations relative to increasing the efficiency therein and *all cases of failure of officers or employees therein to maintain a satisfactory efficiency record, which failure shall be sufficient ground for the dismissal of any such officer or employee.* Such reports shall be deemed public records."

This section concerns only such officers and employees as are already in public service and has no relation to candidates whose names are on an eligible list and certified as such, but not yet appointed. It means what it says, *i. e.,* that on a report from the commission of the failure of an employee to maintain an established grade of efficiency, such employee may be discharged. But the discharge is to be made by the head of the department under Section 486-17, General Code; there is no authority of law for a discharge by the commission under any circumstances.

Rule 135, to which exception was taken by the director, *relates exclusively to promotions* of incumbents and is not in any respect at variance with the statute. Promotions are governed by Section 486-15, General Code, which provides expressly for "promotional examinations" and the use of efficiency records in connection therewith. The entire matter of certifying incumbents for promotion is exclusively within the control of the civil service commission; "discharges," however, are to be made by the executive heads of departments.

On October 16th, 1914, the director sent a second communication to the civil service commission:

"Hon. Civil Service Commission, Gentlemen:

"We have your communication of the 14th inst., with enclosure relative to the appointments from certifications made September 30th, covering appointments for the department of tenement house inspection. We call your attention to our communication to your commission of September 30th, with reference to the qualifications of the men who formerly held the positions of tenement house inspectors. For your further information, we submit the efficiency records of Messrs. Tiernan, White and Arnold as submitted by the building commissioner, Mr. Rendigs. Mr. Rendigs further states that these men have not had the required experience in the building trade and consequently would be ineligible for the positions in question. We would be pleased to take up this matter with your commission at any time in order to arrive at a proper understanding relative to the qualifications necessary for establishing an efficient tenement house department.

"Yours very truly,
"Department of Public Safety,
"Edward P. Durr."

When reading this communication, it is enlightening to recall the fact that the qualifications of tenement house inspectors had been attempted to be fixed by the terms of the ordinance (Section 333-10) in force when Tiernan, White and Arnold were originally appointed in February and March, 1913, and that, after a competitive examination, the civil service commission certified that these men were qualified and fit persons to perform the duties of these positions, and that the qualifications prescribed by the last of the three ordinances on this subject (the one in force when the above communication was sent) are in nowise different from those prescribed by the first ordinance, and that the then existing civil service commission had itself certified that the persons in question were duly qualified under the last ordinance and were fit persons for appointment to the positions in question.

Subsequently, what were called "efficiency records" during the former term of service of Tiernan, White and Arnold as housing inspectors were made up under orders of the director by George

E. Rendigs, building inspector, and sent to the civil service commission, and from these and other information communicated by the director in person, the commission withdrew from the eligible list, already certified by it for appointment, the names of White and Arnold, and sent up a revised list containing the name of Tiernan only.

The statute above referred to (Section 486-18, General Code) requires the civil service commission itself to make investigation and establish its own efficiency lists. While this law contemplates that each department shall maintain records of efficiency of its employees and that they "shall be open at all times to inspection by the commission," it by no means intends that these shall constitute the efficiency records directed to be kept by the civil service commission itself. On the contrary, a clear distinction is made by the language used in this section whereby the former, the department records, are described as the "records, reports and marking of efficiency in each department, office and institution," and the latter, the only record on which the commission can legally act, is characterized as the "efficiency records of the commission," and is directed to be made up by the commission from its own "investigations." It is true that the department records may be taken into consideration in making such "investigations" but they are expressly made "subject to review and correction by the commission," and, in any event, could only become official after examination and adoption by the commission. It is plain that, in this instance, no efficiency records of any of these three men were kept or thought of until after the refusal of the director of public safety to appoint them from the eligible list certified to him by the commission on September 30th, 1914.

The "efficiency records of the commission," if any such existed, could have legally been employed by it either in connection with the making of promotions or in reporting to the head of a department the failure of an *incumbent* to maintain an established grade of efficiency. Such records, if any such there were, were not legally available for any other purpose, and certainly not for removing from an eligible list the names of persons whose efficiency had been established by competitive examination and which had actually been certified for appointment. Least

of all was it lawful in an instance where no grades or lists of efficiency had theretofore been established to make them up, *ex-post facto,* and employ them for the purpose of removing from a certified list the names of persons whose eligibility had been established by the only method permitted by law.

It should be noted that the civil service act itself provides methods of getting rid of unfit or inefficient incumbents of public office or position. Section 486-13, General Code, prescribes that appointments shall be made for a "probationary period of not to exceed three months" and that if the appointee's "service is unsatisfactory" he may be removed at the end of such period "with the approval of the commission," and Section 486-17, General Code, authorizes the appointing officer, on compliance with a few simple requirements, to discharge "incumbents" for cause without trial, at any time. After an applicant for a position in the competitive classified service has had his qualifications and efficiency determined by competitive examination under Section 486-10, General Code, and such additional investigation and inquiry as the commission is authorized to make under the statute above quoted (Section 486-11, General Code) and has been certified by the commission to an appointing officer as eligible for the position to be filled, neither the appointing officer nor the commission itself has any authority to question or dispute such eligibility. Nothing remains other than to make the appointment and, if the appointee is inefficient, remove him at the end of the probationary period or discharge him at the first manifestation of such inefficiency.

Upon the withdrawal of the names of White and Arnold from the certified list, the director of public safety refused to appoint Tiernan, whose name alone remained, and appointed one James A. Gustin, who had not taken any civil service examination and, of course, was not on any eligible list. Later, Gustin submitted to a non-competitive examination and was appointed by the director as provisional "tenement house inspector." Two subsequent requisitions were made by the director for an eligible list for the two remaining positions and each time the single name of Tiernan was certified by the commission, resulting in the selection by the head of the department, first, of Charles A. Tooker and

then of Edward O'Connor, neither of whom had undergone any examination and whose names did not appear on any eligible list. Tooker and O'Connor later submitted to non-competitive examinations and were appointed. The net result of all this has been that three persons who had qualified as required by law, successfully passed competitive examination and, in answer to a requisition of the director of public safety, had been certified on an eligible list for appointment as tenement house inspectors, were all three set aside and three persons who were selected by the director himself, and who at the time had not submitted to any examination whatever, were appointed to these positions and later qualified by passing non-competitive examinations. This result has been brought about by more than one violation of the civil service law, and the appointments of James A. Gustin, Charles A. Tooker and Edward O'Connor were therefore illegal.

As stated, this is an action by a tax-payer to restrain the "misapplication of funds" of the city of Cincinnati and is authorized by the express statute law of this state, Sections 4311 and 4314, General Code. To pay public moneys by way of salary to persons illegally appointed to public office or employment would be a misapplication of such moneys and the tax-payer's application for an injunction to prevent it must be granted.

This case was tried, argued and submitted for decision, and, upon mature consideration, the court held that James A. Gustin, Charles Tooker and Edward O'Connor were so immediately interested in the litigation that they ought to be made parties to the case. Strictly speaking, the court is of opinion that the action could proceed to final decree without these new parties, but it was deemed only equitable to allow them their day in court.

An order was therefore made by the court, on its own motion, making Gustin, Tooker and O'Connor parties defendant in the case and summons was issued and served upon them as provided by law. No answers have been filed by any of these new parties and they are all some weeks in default.

The court is unable to perceive that there is anything to be said on behalf of these parties further than what has already been very fully and ably said by counsel at trial of this case. The questions involved are of a nature calling for immediate deter-

mination, and, as matter of fact, would have been already disposed of but for the necessity of waiting upon possible action by these defendants themselves. No reasons exist for any further delay, and the plaintiff's motion for judgment on the pleadings against these defendants will therefore be granted.